

United States District Court
Southern District of Texas
FILED

SEP 09 2013

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

UNSEALED

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TEXAS, *EX REL.* KEITH WALDMANN and ADAN PONCE,<br><br>Plaintiffs,<br><br>vs.<br><br>McALLEN MEDICAL CENTER, DR. RAY R. FULP, III, ALEX SANTOS, REDMED, INC., and JEFF L. HANNES,<br><br>Defendants. | Civil Action No. **M-13-495**<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND TEXAS MEDICAID FRAUD PREVENTION ACT

### INTRODUCTION

1. Plaintiffs and *qui tam* relators Keith Waldmann and Adan Ponce, by their attorneys, individually and on behalf of the United States of America and the State of Texas, bring this action to recover damages, penalties, and attorneys' fees for violations of the Federal False Claims Act ("FCA") and the Texas Medicare Fraud Prevention Act ("TMFPA") committed by Dr. Ray R. Fulp, III ("Fulp"), Alex Santos ("Santos"), McAllen Medical Center ("MMC"), RedMed, Inc. ("RedMed"), and Jeff Hannes ("Hannes") (collectively "the Defendants"). The Defendants have submitted or caused to be submitted hundreds of false certifications and claims to federal and state agencies in conjunction with requests for payment by Medicare, Medicaid, and TriCare (formerly known as Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)) for surgical and other medical procedures performed at MMC. Unbeknownst to federal and state agencies receiving the claims, and in plain violation of federal and state law, the Defendants have engaged in a pattern and practice of submitting claims that certify that Fulp performed medical procedures on patients, when in reality Fulp was not present

for the procedures. Rather, Santos, an individual who is not licensed to practice medicine in Texas or in any state, performed the procedures without supervision. The procedures included cervical fusions, total knee replacements, and total hip replacements, among other types of complex and potentially dangerous medical procedures. With Santos performing unsupervised surgeries, Fulp was free to schedule double the amount of procedures in a day than he could have otherwise, allowing Fulp and MMC to bill for and collect more funds from government health-insurance programs. MMC knew about and approved the scheme. MMC had received complaints from *qui tam* relators Waldmann and Ponce and others, but MMC did nothing to stop the fraudulent and dangerous activity. Rather, MMC continued to submit its own claims to Medicare, Medicaid, and TriCare, each time certifying that Fulp had performed the procedure.

  2. In addition, Santos was receiving illegal kick-back payments from RedMed and Hannes. RedMed and Hannes sell medical devices to doctors in the Rio Grande Valley and began paying commissions to Santos for all devices Santos and Fulp used in their surgeries. Fulp knew about this illegal arrangement and either was complicit with the scheme or encouraged it. These payments for using RedMed devices plainly violated the Federal Fraud and Abuse Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7b ("Anti-Kickback Statute"), and the Prohibited Referral Provisions, 42 U.S.C. § 1395nn ("Stark Law"), making claims submitted to Medicare, Medicaid, and TriCare that were related to the devices fraudulent under the FCA and TMFPA.

  3. These Defendants have engaged in this pattern and practice since early 2009 and have caused hundreds of false certifications and claims to be made to federal and state agencies. The United States Government and the State of Texas, in reliance upon the Defendants' misrepresentations, have suffered millions of dollars in damages.

  4. Plaintiffs and *qui tam* relators Waldmann and Ponce now seek relief on behalf of the United States Government and the State of Texas for these injuries herein and imposition of statutory penalties and attorneys' fees for the Defendants' violations of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended ("the FCA") and the Texas Medicaid Fraud

2

Prevention Act, Tex. Human Res. Code §§ 36.001, *et seq* ("the TMFPA").

5. Relators bring this action based on their direct knowledge and also on information and belief. The facts and allegations underlying this Complaint have not been publicly disclosed, as public disclosure is defined under 31 U.S.C. § 3730. Notwithstanding this, the relators are original sources of facts alleged in this Complaint, as defined under 31 U.S.C. § 3730(e).

6. As required by the FCA, 31 U.S.C. § 3730(b)(2), and the TMFPA, Tex. Human Res. Code § 36.102, the relators have provided to the Attorney General of the United States, the United States Attorney for the Southern District of Texas, and the Attorney General of the State of Texas simultaneous with and/or prior to the filing of this Complaint, a disclosure statement of all material evidence and information related to the Complaint. This disclosure statement is supported by material evidence known to the relators at the time of this filing, establishing the existence of the Defendants' legal responsibility for those false claims. Because the statement includes attorney-client communications and work product of relators' attorneys, and is submitted to the U.S. Attorney General, the U.S. Attorney, and the Texas Attorney General in their capacity as potential co-counsel in the litigation, these disclosures are confidential.

## RELEVANT FEDERAL AND STATE LAW

7. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of not less than $5,500 and not more than $11,000 for each such claim submitted or paid, plus three times the amount of the damages sustained by the Government. Liability attaches both when a defendant knowingly presents, or causes to be presented, a false claim for payment from the Government and when false records or statements are knowingly used, or caused to be used, for payment from the Government. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (as "relator") on behalf of the Government and to share in any recovery. The Complaint is filed under seal for 60 days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge, and (b) to

determine whether to join the action.

8. The TMFPA similarly provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the State of Texas for payment or approval under the Medicaid program is liable for a civil penalty of not less than $5,000 and not more than $10,000 for each such claim submitted or paid, plus two times the amount of the damages sustained by the State. Liability attaches to a defendant who knowingly makes, or causes to be made, a false statement on an application for payment under the Medicaid program and to a defendant who knowingly makes, or causes to be made, a false statement concerning information required by federal or state law pertaining to Medicaid. In addition, liability attaches if a defendant knowingly charges, solicits, accepts, or receives money as a condition to providing service to a Medicaid recipient if the cost of the service is paid for, in whole or in part, by Medicaid. The TMFPA also allows any person having information regarding a false or fraudulent claim against the State to bring an action for himself on behalf of the State and to share in any recovery.

9. The Anti-Kickback Statute is designed to ensure that healthcare providers make decisions based on the needs of their patients without influence from those who stand to profit from influencing their decisions. The law prohibits any person or entity from offering or accepting a payment or other incentive intended to encourage the recommendation, use, or purchase of any good or service that could be covered under a government health program such as Medicare, Medicaid, or TriCare. 42 U.S.C. § 1320A-7b(b). Any claim submitted to Medicare, Medicaid, or TriCare that is tainted by a kickback is considered a false claim under the FCA and TMFPA.

10. The Stark Law prohibits healthcare providers from billing Medicare, Medicaid, and TriCare for items or services provided based on a referral from a physician with whom the provider has a financial relationship. 42 U.S.C. § 1395nn. The term "referral" is defined broadly and includes any "request by a physician for [an] item or service." Financial relationships include ownership interest in an entity as well as a compensation arrangement

4

between a physician and an entity. If a physician has a financial relationship with an entity, the physician cannot request items or services from the entity and cannot bill third parties for those items or services. Any claim submitted to Medicare, Medicaid, or TriCare that is tainted by a Stark Law violation is considered a false claim under the FCA and TMFPA.

11. Based on these provisions, *qui tam* plaintiffs and relators Keith Waldmann and Adan Ponce seek through this action to recover damages, civil penalties, and attorneys' fees arising from the Defendants' submission, or actions that caused the submission, of false and fraudulent claims, records, and statements to the United States Government and the State of Texas in order to obtain payments from Medicare, Medicaid, and TriCare.

## **GOVERNMENT HEALTHCARE PROGRAMS**

12. The Medicare program, as enacted under Title XVIII of the Social Security Act of 1965, 42 U.S.C. §§ 1395, *et seq.*, pays for costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with certain diseases.

13. The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, provides medical assistance for indigent individuals. Although federally created, the Medicaid program is a joint federal-state program. Both the United States and the State of Texas fund the Medicaid program.

14. TriCare Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TriCare contracts with fiscal intermediaries and managed care contractors to review and pay claims.

15. An explanation of how the government is billed for qualified healthcare is crucial to understanding how the Defendants are liable under the FCA and TMFPA. There are two general components to government-funded healthcare, Part A and Part B. Part A is for hospital billing and skilled nursing care. Part B is for physician or physician-group billing. Every claim submitted by either a hospital or a physician must include a billing number.

16.  In Texas, to obtain a billing number, a hospital or physician must complete an application and forward it to Blue Cross/Blue Shield of Texas. Blue Cross/Blue Shield serves as the Texas Medicare administrator.

17.  Upon approval, the hospital or doctor receives a Medicare provider number, which is used as an identifier on billing forms. This provider number is cross-referenced with the provider's tax ID number.

18.  When submitting a bill to Medicare, the healthcare provider must use code numbers to identify which services, diagnoses, or procedures were rendered. These billing codes are contained in federal manuals.

19.  Physicians enter these codes on form CMS-1500. Hospitals use form CMS-1450. Both forms are universal and are submitted to most third-party payors of healthcare services, including Medicare, Medicaid, and TriCare. The forms are submitted electronically and designed to be read quickly and easily. The codes entered onto the forms establish what services were performed, by whom, and how much the government is charged. Based on these codes, Medicare, Medicaid, and TriCare determine how much they will pay.

20.  When submitted under either Part A or Part B, physicians and hospitals are responsible for ensuring that all Medicare claims accurately reflect the services rendered and by whom. On the back of form CMS-1500, for example, the physician certifies that the services listed were medically necessary and "were personally furnished by me or my employee under my personal direction." In addition, the form carries the warning:

> **NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.**

21.  Examples of false healthcare claims to the Government include:

   a. The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is not provided as claimed. 42 U.S.C. § 1320a-7a(a)(1).

6

   b. The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is false or fraudulent. 42 U.S.C. § 1320a-7a(a)(1)(B); 42 U.S.C. § 1320a-7b(a).

   c. The healthcare practitioner or provider presents a claim for payment for a medical item or service that the person knows or should know is not provided by a licensed physician. 42 U.S.C. § 1320a-7a(a)(c)(i).

   d. The healthcare practitioner or provider submits a claim found to be false, fictitious or fraudulent or supported by a written statement that is false fictitious, fraudulent or lacking a material fact required to be included. 31 U.S.C. § 3801 et seq.

22. Simply put, government-funded healthcare is run on an honor system. Both the federal and state government rely on accurate codes and truthful representations when receiving claims. The entire network of government payors for healthcare is designed to assure American taxpayers that they pay only for medically necessary medical and hospital services ordered and rendered by qualified physicians.

## PARTIES

23. *Qui tam* plaintiff and relator, Keith Waldmann ("Waldmann"), is a resident of San Antonio, Bexar County, Texas. Waldmann brings this action for violations of 31 U.S.C. §§ 3729, *et seq.* on behalf of himself, the United States Government pursuant to 31 U.S.C. § 3730(b)(1), and the State of Texas pursuant to Texas Human Resources Code § 36.101. Waldmann has personal knowledge of the fraudulent practices regarding the Defendants' claims submitted for payment by Medicare, Medicaid, and TriCare.

24. *Qui tam* plaintiff and relator, Adan Ponce ("Ponce"), is a resident of McAllen, Hidalgo County, Texas. Ponce brings this action for violations of 31 U.S.C. §§ 3729, *et seq.* on behalf of himself, the United States Government pursuant to 31 U.S.C. § 3730(b)(1), and the State of Texas pursuant to Texas Human Resources Code § 36.101. Ponce has personal knowledge of the fraudulent practices regarding the Defendants' claims submitted for payment by Medicare, Medicaid, and TriCare.

25. Defendant Fulp is a resident of McAllen, Hidalgo County, Texas. Fulp is a physician who practices at MMC and other hospitals in the Rio Grande Valley.

26. Defendant Santos is a resident of McAllen, Hidalgo County, Texas. Santos is a Surgical Technologist 1st Assistant ("scrub tech") who works at MMC.

27. Defendant MMC is a Texas corporation with its principal place of business in McAllen, Hidalgo County, Texas.

28. Defendant RedMed, Inc. is a Texas corporation with its principal place of business in McAllen, Hidalgo County, Texas.

29. Jeff Hannes is a resident of McAllen, Hidalgo County, Texas. Hannes is the President of RedMed, Inc.

## JURISDICTION AND VENUE

30. This Court has jurisdiction over the subject matter of this FCA action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

31. This Court has pendent jurisdiction over this case for the claims brought on behalf of the State of Texas pursuant to 31 U.S.C. § 3732(b), inasmuch as recovery is sought on behalf of the State of Texas which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

32. This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, transacts business or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. During the relevant period, Defendants resided and/or transacted business in the Southern District of Texas and many of the violations of 31 U.S.C. § 3729 described herein occurred within this judicial district.

33. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the Defendants can be found in, reside in, and/or transact business in the Southern District of Texas and because many of the violations of 31 U.S.C. § 3729 described herein occurred within this

judicial district.

## BACKGROUND

## FALSE CLAIMS

34. In 2011, relators Waldmann and Ponce were employed by Smith & Nephew as medical-device sales representatives in the Rio Grande Valley. They sold surgical implants and trauma-room devices to hospitals and doctors in the area, including Defendants Fulp and MMC. Fulp practices at Defendant MMC, as well as other area hospitals, as an orthopedic surgeon.

35. Waldmann and Ponce have known Fulp since at least 2008. In addition to their business relationship, Fulp came to rely on both Waldmann and Ponce while Fulp operated on his patients. At Fulp's request, Waldmann and Ponce would "scrub into" the operating room so that they could assist Fulp by, among other things, opening medical-device packaging, ensuring Fulp had all items necessary to complete the scheduled procedure, and answering questions about how the medical device worked and fit.

36. Beginning in early 2011, Waldmann and Ponce noticed a significant increase in Fulp's schedule of medical procedures, including hip replacements, knee replacements, and other procedures. Before 2011, Fulp would generally perform seven procedures a day, three times a week. But in 2011, Waldmann and Ponce noticed that Fulp started scheduling up to fifteen procedures a day, three times a week.

37. Defendant Santos was integral to Fulp's ability to bill for a greatly increased number of procedures. Santos worked at MMC as a Surgical Technologist 1st Assistant, which is commonly referred to as a scrub tech. Scrub techs are not licensed physicians. They do not attend medical school and do not become licensed to practice medicine. Instead, they have one to two years of vocational training and may or may not be certified in their field of education. Hospitals employ scrub techs to generally assist surgeons, hand them instruments, keep supplies stocked, clean operating rooms, clean incision sites, and occasionally close incisions. They are not, however, trained—or authorized—to perform surgeries, regardless of whether a licensed physician supervises their work. Because they are not licensed physicians, they cannot obtain

9

the appropriate billing numbers to submit claims to government health-insurance programs.

38. Waldmann and Ponce realized how Fulp had doubled his scheduled procedures when they witnessed, first hand, that Santos was performing surgeries without Fulp. On numerous occasions, Waldmann and Ponce independently witnessed Fulp attend the start of a surgery and perform initial incisions, only to leave the room entirely and turn the remainder of the surgery over to Santos. Without direction or supervision from Fulp, Santos would cut through tissue and bone, install artificial joints, and close the entire incision site. This allowed Fulp to leave the operating room to perform, or begin, other surgeries and procedures at MMC. While Santos was performing these operations, at no time did he possess a license to practice medicine. And at no time was he supervised by Fulp.

39. Waldmann and Ponce witnessed Fulp turn procedures over to Santos almost every time they were in an operating room with Fulp. They saw Santos complete numerous procedures, without Fulp's supervision, including epidural steroid injections, pulling infected pins from patients who had previously undergone surgery, a cervical fusion, inserting scoliosis pins, a total knee replacement, and a total hip replacement. It happened so often that there are too numerous occasions to list in this Complaint. Examples going to back to 2009, however, have been documented with MMC.

40. On March 23, 2012, Fulp left the operating room for two different patients undergoing a total knee replacement. For each patient, Fulp was in the operating room for only 5 minutes of the 90-minute procedure before turning the surgery over to Santos and leaving. Oscar Garcia, another medical-device sales representative with Smith & Nephew, reported these incidents to Mia Fernandez, the Assistant Surgical Director at MMC. Fernandez reported the complaint to MMC administrators, but MMC took no action, and Santos continued to complete surgeries unsupervised.

41. Elizabeth Meza, a nurse employed by MMC, also made numerous reports to MMC administrators. On several occasions, while working in the operating room with Fulp and Santos, Meza witnessed Fulp leave the room and Santos complete the procedure. MMC did

nothing in response to Meza's reports, and Santos continued to complete surgeries unsupervised. Fulp may have discovered these complaints because he later posted a sign on a wall in the hospital that there was a "rat" and that the rat would suffer consequences.

42. Ponce also recorded a video with his iPhone in which Santos performs surgery while Fulp is not in the operating room. Ponce offered the video to MMC's Surgical Director, Mario Garza. Ponce became frustrated that MMC took no action and eventually turned the video over to the FBI. On information and belief, the FBI still possesses the video recording.

43. Not long after Ponce offered the video to MMC, Fulp discovered that Ponce had reported Fulp's activities. Fulp became hostile and extremely profane. Upon Ponce's arrival in the operating room one day, Fulp announced that "the piece of [expletive] photographer is here." Fulp also threatened Ponce, calling him a "mother[expletive]," asking why Ponce was "[expletive] with his livelihood," and—after inviting Ponce to settle matters outside—whispering that he would beat Ponce up "like a little [expletive] if you go to the state board."

44. In addition to seeing Fulp leave operations to Santos, there were other indicia that Fulp and Santos worked together to increase Fulp's scheduled procedures. For example, in May or June of 2013, Santos served a three-day suspension for violating HIPAA regulations. While Santos was suspended and could not work at MMC, Fulp cancelled all of his scheduled procedures. On certain days, Fulp's 2nd, 3rd, and 4th patients would be in the recovery room while Fulp's 1st patient was still in surgery. At times, Santos was the person to meet patients' families and discuss the results of the operations.

45. Fulp is an approved Medicare physician with a billing number. Likewise, MMC is an approved institution with a billing number. Both Fulp and MMC submitted bills to Medicare, Medicaid, and TriCare for professional services to patients, which were ultimately paid by, through, or under the auspices of the United States Government or the State of Texas, as described above.

46. Santos did not bill for patient care because he could not without a valid billing number. Nevertheless, Santos performed unsupervised procedures and allowed Fulp and MMC

11

to submit claims for those procedures as if Fulp had performed them. He therefore contributed to the scheme and caused fraudulent bills to be submitted by Fulp and MMC.

47. When Fulp and MMC submitted their separate claims to the United States Government and the State, both warranted and represented that the services in such claims were rendered by Fulp, a duly licensed physician, or were rendered by someone under Fulp's direct supervision. Many of the professional services rendered, if not all of them, in part or in whole to the patients, were nevertheless those of Santos without any supervision from Fulp.

48. Thus, false claims were submitted, and the Government and State defrauded, because Fulp, Santos, and MMC participated in a scheme that allowed Santos, without authority or supervision, to operate on Medicare, Medicaid, and TriCare patients in direct violation of federal and state law.

49. MMC was aware of this scheme. Multiple individuals complained to MMC management, but MMC took no action. Santos continued to perform unsupervised medical procedures, and Fulp and MMC continued to bill Medicare, Medicaid, and TriCare as if Fulp had performed or directly supervised the procedures.

50. MMC made a concerted effort to conceal and perpetuate the scheme so that Fulp could continue his overdone surgery schedule. MMC has a strong financial incentive to maintain Fulp's high volume of surgeries. On information and belief, Fulp charges Medicare and Medicaid about $1,100 per surgery; MMC charges about $16,000 per surgery.

51. The examples provided in this Complaint are only a few examples of the overall scheme to file false claims. But they provide fair notice for the types of instances at issue in this Complaint.

52. The total amount of false claims for all patients is inestimable at this stage of the litigation. But it likely amounts to many millions of dollars.

**STARK AND ANTI-KICKBACK VIOLATIONS**

53. Separate from the medical-procedure scheme, Santos and Fulp were involved in another scheme with Defendants Hannes and RedMed. Fulp used medical devices from Smith &

Nephew for many years. But Fulp largely stopped using Smith & Nephew devices in favor of RedMed devices when Santos began working with Fulp.

54. In the spring of 2011, soon after Santos started working with Fulp, Santos approached Ponce with a request that they "work together." Santos promised to increase Ponce's business if Santos could get a cut of the sales. Ponce at first thought Santos wanted to leave MMC and work for Smith & Nephew. But Santos made it clear that he wanted to keep working as a scrub tech *and* get paid by Smith & Nephew, in violation of federal law. Ponce refused, and Santos proposed disguising payments to him by having Ponce or Smith & Nephew write checks to Santos's disabled brother for a no-show job, purportedly for helping Ponce around the office.

55. When Ponce refused again, Santos told him that there were other medical device representatives who would willingly make the same deal. Soon after these threats, Ponce's sales of devices to Fulp dropped substantially, and Ponce noticed that other device representatives had lost Fulp's business as well. Instead, Fulp was obtaining medical devices from RedMed of McAllen. Ponce learned that RedMed was paying kickbacks to Santos, that RedMed paid Santos a portion of the commission on devices used in Fulp's scheduled surgeries, and that RedMed's President, Jeff Hannes, had arranged the relationship.

56. Fulp was aware of the Santos/RedMed financial relationship and was either complicit in it or helped establish the arrangement. Not long after the decline in Ponce's sales to Fulp, Ponce attended a barbecue and staff birthday party at Fulp's house. There, Fulp pulled Ponce aside and said that he wished Ponce could work with Santos the way RedMed was working with Santos. Fulp complained that Ponce was "forcing [Fulp] to work with piece of [expletive] equipment" from RedMed.

57. Waldmann observed first hand that Santos was receiving checks from RedMed. In March 2013, Waldmann left Smith & Nephew to work briefly for RedMed. Waldmann observed Santos turning in sales sheets like other RedMed sales staff for payment processing. When RedMed distributed checks to its employees, Santos would receive a check too. Waldmann determined that RedMed was paying commissions to Santos for using RedMed

13

medical devices. Waldmann left RedMed after only a few months and relocated to San Antonio. He no longer works in the healthcare field.

58. RedMed has offered payments and other incentives to Santos and Fulp for use of its products in clear violation of the Anti-Kickback Statute. Moreover, Fulp's use of RedMed products have not been based on the needs of his patients. Rather, Fulp has been influenced by these payments and incentives. Fulp and RedMed have received the benefit of Santos's services while Santos illegally receives payments from RedMed. Because Santos receives commissions from RedMed, Santos's interests are aligned with Fulp and MMC to overload the number of Fulp's scheduled procedures. As a result of these violations of the Anti-Kickback Statute, any claim submitted to Medicare, Medicaid, or TriCare for reimbursement for use of RedMed's devices is tainted and considered a false claim under the FCA and TMFPA.

59. Fulp and Santos have a financial relationship with RedMed by way of the compensation agreement between them. Thus, Fulp and MMC violate the Stark Law each time they bill Medicare, Medicaid, and TriCare for RedMed's items. Any claim submitted to Medicare, Medicaid, or TriCare for RedMed products is therefore tainted and considered a false claim under the FCA and TMFPA.

## COUNT 1

### Violations of the Federal False Claims Act

### [31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B)]

60. *Qui tam* plaintiffs and relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

61. This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

62. Through the acts described above, Defendants submitted and/or caused to be submitted to officers, employees, or agents of the United States Government false or fraudulent claims for payment or approval under the Government's Medicare, Medicaid, and/or TriCare program with knowledge of their falsity, or with grossly negligent or reckless disregard of facts

and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

63. Through the acts described above, Defendants made, used, or caused to be made or used, false records and statements to obtain government payment of false or fraudulent claims which would not have been paid if the truth were known. Defendants had knowledge of the falsity of the records or statements, or had grossly negligent or reckless disregard of facts and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

64. Plaintiff, the United States Government, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance on the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

65. By reason of defendants' false records, statements, claims, and omissions, the United States has been damaged in the amount of many millions of dollars. For each bill that is tainted by the Defendants' illegal acts and scheme, the United States Government is entitled to treble damages and forfeitures as well as a $5,500 to $11,000 penalty per fraudulent claim submitted by Defendants.

## COUNT 2

### False Claims Conspiracy

### [31 U.S.C. §§ 3729(a)(1)(C)]

66. *Qui tam* plaintiffs and relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

67. This is a claim for treble damages and forfeitures under the FCA, 31 U.S.C. §§ 3729, *et seq.*, as amended.

68. Through the acts described above, Defendants entered one or more conspiracies among and between themselves and others to defraud the United States Government by getting

false and fraudulent claims approved or paid. Defendants, moreover, took substantial steps in furtherance of those conspiracies by preparing false records and claims and submitting such documents to the Government via the Medicare, Medicaid, and TriCare system for payment or approval.

69. A known or intended result of Defendants' conspiracy was to induce the Government to pay for physician services performed by someone who was not the physician listed in the claim and/or for fraudulent hospital services and medical care as described above.

70. Plaintiff, the United States Government, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance of the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

71. By reasons of Defendants' conspiracies, and the acts taken in furtherance thereof, the United States Government has been damaged in a substantial amount. For each bill that is tainted by Defendants' illegal acts and conspiracy, the United States Government is entitled to treble damages and forfeitures as well as a $5,500 to $11,000 penalty per fraudulent claim submitted by Defendants.

## COUNT 3

### Violations of the Texas Medicaid Fraud Prevention Act

### [Tex. Human Res. Code § 36.001 *et seq.*]

72. *Qui tam* plaintiffs and relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 59 of this Complaint.

73. This is a claim for double damages and forfeitures under the TMFPA, Tex. Human Res. Code Ann § 36.001, *et seq.*, as amended.

74. Through the acts described above, Defendants made and/or caused to be made a false statement or misrepresentation of a material fact on an application for payment under the Medicaid program with knowledge of the misrepresentation, or with grossly negligent or

reckless disregard of facts and conditions that would indicate that said statements or records were inaccurate or inappropriate and false.

75. Through the acts described above, Defendants made, caused to be made, induced, or sought to induce the making of false statements or misrepresentations of material fact concerning information required to be provided by federal and/or state laws, rules, and regulations pertaining to the Medicaid program.

76. Plaintiff, the State of Texas, unaware of the falsity of these claims, records, and/or statements made by Defendants, and in reliance on the accuracy thereof, paid Defendants for medical and/or physician services performed by someone who was not the physician listed in the claim, record, and/or statement and/or services that were tainted by violations of federal law.

77. By reason of defendants' false records, statements, claims, and omissions, the State of Texas has been damaged in the amount of many millions of dollars. For each bill that is tainted by the Defendants' illegal acts and scheme, the State of Texas is entitled to double damages and forfeitures as well as a $5,000 to $10,000 penalty per fraudulent claim submitted by Defendants.

## PRAYER

78. WHEREFORE, *qui tam* plaintiffs and relators pray for judgment against Defendants as follows:

79. That Defendants cease and desist from violating 31 U.S.C. §§ 3729, *et seq.* and Texas Human Resources Code § 36.001, *et seq.*

80. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, two times the amount of damages the States of Texas has sustained as a result of Defendants' actions, and a civil penalty against each defendant of $11,000 for each violation of 31 U.S.C. § 3729, *et seq.*, and $10,000 for each violation of Texas Human Resources Code § 36.001, *et seq.*

81. That *qui tam* plaintiffs and relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and Texas Human Resources Code § 36.110.

82. That *qui tam* plaintiffs and relators be awarded all costs and expenses of this action, including attorneys' fees and court costs; and

83. That the United States and *qui tam* plaintiffs and relators receive all such other relief as the Court deems just and proper.

## JURY DEMAND

84. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* plaintiffs and relators hereby demands trial by jury.

Dated: September 9, 2013

Respectfully submitted,

/s/ Mitchell C. Chaney

Mitchell C. Chaney
State Bar No. 04107500
S.D. Tex. Bar No. 1918
COLVIN, CHANEY, SAENZ & RODRIGUEZ, L.L.P.
1201 East Van Buren Street
P.O. Box 2155
Brownsville, TX 78522-2155
Telephone: (956) 542-7441
Telecopy: (956) 541-2170

Victor Rodriguez
State Bar No. 24041809
S.D. Tex. Bar No. 562260
Nicondra Chargois-Allen
State Bar No. 24031935
S.D. Tex. Bar No. 872210
COLVIN, CHANEY, SAENZ & RODRIGUEZ L.L.P.
323 W. Cano, Suite 100
Edinburg, TX 78539
Telephone: (956) 380-0213
Facsimile: (956) 380-0254

Richard W. Hess
State Bar No. 00785947
S.D. Tex. Bar No. 605712
Johnny W. Carter
State Bar No. 00796312
S.D. Tex. Bar No. 21988
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

*Attorneys for Relators Keith Waldmann and Adan Ponce*